NUMBER 13-05-00267-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


CALANDRA TRISH BADIA, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 24th District Court of Victoria County, Texas.


 


MEMORANDUM OPINION



Before Justices Hinojosa, Rodriguez, and Garza


Memorandum Opinion by Justice Hinojosa



 A jury found appellant, Calandra Trish Badia, guilty of the offense of capital murder,
and the trial court assessed her punishment at life imprisonment. Appellant challenges her
conviction in four issues. We affirm. 

A. Background


 On the afternoon of October 28, 2002, appellant was home with her two children,
nineteen-month-old Dravyn Hohensee and three-month-old Jordan Badia. At
approximately 5:00 p.m., Ron Hohensee, Dravyn's father and Jordan's stepfather, received
an emergency page from appellant. When he called her, appellant told him that something
was wrong with Jordan and he needed to come home immediately. When he arrived at
home, Ron found Jordan on the couch very limp. Ron immediately rushed him to the
emergency room at Citizens Medical Center in Victoria. Later that night, Jordan was
transferred to Santa Rosa Children's Hospital in San Antonio. After his arrival at Santa
Rosa, it was determined that Jordan was brain dead, and he was removed from life
support. The cause of death was determined to be blunt force trauma to the head.

B. Sufficiency of the Evidence


 In her third and fourth issues, appellant contends the evidence is legally and
factually insufficient to support her conviction.

 The standard of review for challenges to the legal and factual sufficiency of
evidence is well settled. See Jackson v. Virginia, 443 U.S. 307, 319 (1979) (legal
sufficiency); Young v. State, 14 S.W.3d 748, 753 (Tex. Crim. App. 2000) (legal sufficiency);
Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (factual sufficiency); Malik v.
State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (legal and factual sufficiency). 

 A person commits the offense of murder if she "intentionally or knowingly causes
the death of an individual." Tex. Pen. Code Ann. § 19.02(b)(1) (Vernon 2003). A person
commits the offense of capital murder if "the person commits murder as defined under
Section 19.02(b)(1) and . . . the person murders an individual under six years of age." Tex.
Pen. Code Ann. § 19.03(a)(8) (Vernon Supp. 2005).

 The indictment alleged that on or about October 28, 2002, appellant intentionally or
knowingly caused the death of Jordan Badia, an individual younger than six years of age,
"by shaking the decedent with her hand or hands, a deadly weapon, and by striking the
decedent with and against an object, a deadly weapon, the exact nature of which is
unknown to the Grand Jurors, and any combination thereof . . . ."

1. Ron Hohensee


 Ron testified that he had been in a relationship with appellant for approximately five
years and that they had lived together "on and off." Although they were never married,
appellant and Ron had a child together, Dravyn. Ron further testified that although he
discovered shortly after Jordan was born that he was not Jordan's biological father, he
considered Jordan his son. On October 28, 2002, Ron left the house at approximately
4:30 p.m., and appellant was home alone with Jordan and Dravyn. Around 5:00 p.m. he
received a "911" page from appellant. When he called her, appellant told him that
something was wrong with Jordan. Ron described appellant's voice as not really stressed
or excited, but that he could tell something was wrong. When he arrived home, appellant
told him that Dravyn had fallen on top of Jordan while Jordan was in his bouncy seat on
the floor. Ron testified that:

Jordan was on the couch, with his arms out to the side. His eyes were half
open. The left side of his head was quite large and you could tell he was in
trouble.


He picked Jordan up and immediately took him to the hospital. When he told appellant to
"come on," she said that she had to put Dravyn's shoes on, and he left without her. Twenty
to thirty minutes later, appellant arrived at the hospital with one of her friends, Suzanne
Lawrence. Ron testified that when she arrived, appellant did not show any emotion, and
once Jordan was stable and they were allowed to be with him, appellant did not want to
stay very long. While appellant was at the hospital, she showed no emotion or grief and
did not cry at all. 

 Ron further testified that approximately two days after the incident, she told him a
different story about what had happened to Jordan. She now said that while she was
carrying Jordan, she had tripped over an extension cord that ran from the wall to a box fan
and fell on him. However, Ron also said that shortly before the police arrived to further
investigate her second explanation, appellant adjusted the cord to the box fan; the cord
was under the carpet and she moved it on top of the carpet.

 Ron testified that while appellant would do anything to comfort and care for Dravyn,
there was an incredible difference in how she treated Jordan when it came to things like
feeding and holding, and she talked about putting Jordan up for adoption. He said that
appellant showed no emotion after Jordan's funeral. Ron also testified that after appellant
was taken into custody, he and two friends tried to re-create the accident appellant had
described. He said that a friend who was about the same height and size as appellant
made several attempts, and each time the cord would come unplugged or the fan would
come off the table.

2. Jennifer Schumann


 Registered Nurse Jennifer Schumann testified that on October 28, 2002, she was
the triage nurse at Citizens Medical Center in Victoria and received Jordan into the
emergency room at approximately 5:05 p.m. At the time Jordan arrived, he was not
breathing, had a very low pulse rate, was pale, his eyes were closed, and he was limp and
seemed "lifeless." She said that when Ron handed Jordan to her, the only information he
gave her was that Jordan was not "doing good" and that he did not know what happened
because he was not there. Although she did not notice any exterior physical trauma
immediately, once a sustained heart rate and circulation was restored, she noticed bruises
on both of Jordan's arms. Schumann described appellant's demeanor as very "stoic" and
as having a "flat effect," and opined that in her experience in giving family members
updates on the condition of a loved one, appellant "did not act in a way that [she] had ever
seen anybody act before. She seemed kind of emotionless." 

3. Dr. John McNeill


 Dr. John McNeill testified that he was the emergency room physician on duty at
Citizens Medical Center when Jordan was brought in. He testified that upon presentment,
Jordan's heart was not beating and he was not breathing. After emergency measures,
they were able to obtain a pulse and blood pressure, and Jordan was placed on
mechanical ventilation. Dr. McNeill also testified that there were no signs of trauma
initially, but after return of circulation he noticed bruising to the "upper extremities." Dr.
McNeill opined that it takes something catastrophic to make an infant stop breathing or
cause serious injury to an infant. His physical examination was totally inconsistent with
minor trauma, such as the type described by appellant at the hospital. In his opinion, the
injuries suffered by Jordan could not have been caused by a nineteen-month-old toddler.

4. Dr. Richard Cartie


 The State also presented the testimony of Dr. Richard Cartie, a pediatric intensive
care physician and the physician on call the night Jordan was transferred to Santa Rosa
Children's Hospital. Dr. Cartie testified that when he first saw him, Jordan was on a
ventilator, was extremely pale, his head was grossly misshapen and swollen in areas, and
there was bruising in the area of his left shoulder. Dr. Cartie explained that a misshapen
head results from bleeding between the scalp and the skull, and that in Jordan's case,
there was swelling to such an extent that it was hard to tell if there was one particular area
of injury. The trial court admitted into evidence CT scans taken of Jordan's head that Dr.
Cartie explained showed that (1) Jordan's brain was extremely swollen and pushing into
his skull, (2) there was extensive bleeding into Jordan's brain, bleeding between his brain
and skull and collections of blood along the bottom part of his brain, and (3) a fracture in
Jordan's skull. Dr. Cartie opined that the injuries suffered by Jordan were consistent with
those typically found in cases of abusive head trauma. Dr. Cartie further opined that the
retinal bleeding sustained by Jordan "really does not result from any other sort of injury or
illness, besides some type of abusive head trauma," and that it "has always been
considered to be one of the very significant indicators, if not nearly absolute indicators, of
head trauma in child abuse."

 Dr. Cartie testified that the severity of the injuries was absolutely inconsistent with
the background he was given, specifically that Jordan had been asleep in his bouncy chair
when his mother heard a loud noise from the other room and found Jordan on the floor with
his nineteen-month-old sibling on top of him. In Dr. Cartie's opinion, neither a nineteen-month-old falling on Jordan nor an adult falling with him, would cause the massive head
trauma suffered by Jordan. He opined that someone intentionally caused Jordan's injuries.

5. Joyce Parker


 Joyce Parker, a neighbor of appellant and Ron, testified that after a fight, to get back
at Ron, appellant slept with his best friend and as a result became pregnant with Jordan. 
Joyce testified appellant told her that she did not like Jordan because he reminded her of
the guy with whom she had slept. Joyce also said appellant told her that she did not love
the baby, did not want the baby, and wanted to give it to Joyce and her husband. 
According to Joyce, appellant would come to her house frequently and talk about not
wanting anything to do with Jordan. While appellant took good care of Dravyn, she ignored
Jordan. Appellant would leave Jordan in a wet diaper and not change him, would not burp
him after feeding, and would "just let him lay there." Because of the way appellant felt and
talked about Jordan, when Joyce first heard that the child was dead, her first thought was
"what did [appellant] do?" Joyce said that after the funeral, appellant acted like nothing
had happened and almost seemed relieved that the baby was gone. 

6. Charity Horton


 Charity Horton testified that she has known appellant for approximately six years. 
Charity said that appellant did not show any love or affection for Jordan. At Jordan's
funeral appellant seemed more concerned about herself and "making everyone else
believe that she had some kind of feelings," but she did not express any genuine sorrow
or grief. When Charity asked appellant what happened, appellant told her that she had just
tripped over an extension cord. Charity did not find the story credible because while
appellant said she fell face first onto the linoleum floor, she did not appear to be hurt or
bruised in any way. Charity said that on two occasions she went over to appellant's house
to visit and found Jordan in a diaper so wet that it was leaking, and his bed was saturated
with urine.

7. Cindy Saunders


 Cindy Saunders, also a friend of appellant for many years, testified that when she
would visit, Jordan would usually be in his crib attached to his heart monitor, and appellant
did not hold him very often. She said appellant told her that when she was walking from
the kitchen to the living room with Jordan, she tripped over an extension cord and fell on
top of him. However, when Cindy tried to recreate the accident with Ron, the extension
cord came unplugged from the wall every time. Cindy testified that she never saw any
bruises or injury to appellant around the time of the incident. Like Charity, Cindy testified
that on two occasions she went over to appellant's house to visit and found Jordan in a
diaper so wet that it was leaking, and his bed was saturated with urine.

8. Dr. Randall Frost


 Dr. Randall Frost, deputy medical examiner of Bexar County, testified regarding
Jordan's autopsy. Dr. Frost said there was bruising around Jordan's head, including three
small bruises on his forehead, one just above his right ear, a large area of bruising over the
left side of his head, and a "U"-shaped bruise on the back of his head. Although he
testified that he could not be certain, in his opinion the three small bruises on the forehead
were appropriately placed to be fingertip marks, and the "U"-shaped bruise suggests that
there was something that the head struck or that struck the back of the head that had a "U"
shape or was partially circular, though he was not certain what that object might have been. 
 In addition, there was swelling of one eye, extensive bleeding beneath the scalp, and a
star-shaped fracture at the back of the child's skull that extended twenty-seven centimeters
around both sides of Jordan's head.

 The autopsy also revealed a great deal of blood surrounding the brain and
extending down the spinal cord from the brain, and bleeding in the right optic nerve. Dr.
Frost said that the bleeding was quite significant for a baby of Jordan's size. He explained
that most children who have a fall will sustain a simple linear fracture, not the type of
complex fracture found on Jordan where the skull was broken in many areas. The type of
fracture found on Jordan would require a great amount of force because a baby's skull is
still flexible. In his opinion, a two-year-old does not have enough strength or enough body
mass to cause these injuries, unless the two-year-old pushed the baby from an upper-story
window. Dr. Frost opined that if an adult had fallen while carrying Jordan, considering the
injuries to the baby, there would be injuries to the adult as well.

9. Detective Tom Copeland


 Detective Tom Copeland testified that during his interview of her, appellant did not
behave like someone who had just lost a child and exhibited very little emotion. He
testified that appellant gave him two different stories regarding how Jordan had sustained
his injuries. Appellant first told Copeland that Dravyn had fallen on top of Jordan when
Jordan was in his bouncy chair on the floor. But after Copeland spent quite a bit of time
explaining to appellant that Jordan's extensive injuries could not have been caused by that,
she "just all of a sudden, said, 'Okay, I fell on him,' very nonchalantly."

 Copeland further testified that after he spoke with the medical examiner about
appellant's second version of events, appellant was photographed to determine if she had
any bruises that may have resulted from the fall. The photographs were submitted into
evidence, and Copeland testified that they did not reveal any bruises on appellant. 
Appellant's videotaped statement was submitted into evidence and played for the jury. 

10. Suzanne Lawrence


 In appellant's defense, Suzanne Lawrence, a friend of appellant and Ron, testified
that Ron told her at the hospital that on the way to the hospital with Jordan, he had stopped
because of a traffic accident and got out and helped move a car.


11. Alexander Lawrence


 Alexander Lawrence, a longtime friend of appellant, testified that on the morning the
police came to recreate the alleged fall, he was there with appellant and Ron, and all three
of them had a beer, but it was very unusual for them to have beer at that time of day. 

12. Jack Greeson


 The defense also presented the testimony of psychologist Jack Greeson. He
testified about the concept of "psychic numbing," in which a person is overwhelmed to the
point where she appears to show no emotion at all. Dr. Greeson also testified about "bi-polar disorder." During the "manic" phase of bi-polar disorder, the person is abnormally or
excessively elevated in her mood and people often think she is inappropriately happy or
silly, out of the normal range of what would be expected; during the "depressed" phase of
bi-polar disorder, the person would be very listless, not have much energy, and her
emotions would be minimal or "flat."

 Dr. Greeson testified there are some people who just do not show emotions like
others normally expect, and there is no universal or mandatory way of expressing
emotions. Human beings may exhibit a wide range of reactions to a traumatic event,
influenced by their previous experiences and personality. Dr. Greeson opined that
appellant's described behavior would be consistent with someone who has bi-polar
disorder or is suffering from post-traumatic stress. He said that appellant has been
diagnosed with bipolar disorder, and during his examination of her, appellant demonstrated
the classic symptoms of the disorder. Dr. Greeson also testified that appellant admitted
to having extensively used alcohol and drugs.


13. Other Witnesses


 Appellant's attorneys elicited testimony from several of the witnesses that it is
normal for people to bruise at different rates, and that some people bruise more easily than
others.

 The jury, as the sole judge of the credibility of the witnesses and the weight to be
given their testimony, is free to accept or reject all or any part of the testimony of any
witness. Tex. Code. Crim. Proc. Ann. art. 38.04 (Vernon 1979); Cain v. State, 958 S.W.2d
404, 408-09 (Tex. Crim. App. 1997); Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App.
1986); Bowden v. State, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982). In determining the
sufficiency of the evidence, we must presume that the trier of fact resolved any conflict in
testimony in favor of the prosecution, and must defer to that resolution. Jackson, 443 U.S.
at 326; Matson v. State, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

 After reviewing all the evidence in the light most favorable to the verdict, we
conclude that any rational trier of fact could have found the essential elements of the
offense of capital murder beyond a reasonable doubt. See Jackson, 443 U.S. at 319;
Young, 14 S.W.3d at 753; Malik, 953 S.W.2d at 240. Accordingly, we conclude that the
evidence is legally sufficient to support appellant's conviction. In addition, after a neutral
review of the evidence, we conclude that the evidence is not so weak as to be clearly
wrong and manifestly unjust, nor is there contrary evidence that makes the finding of guilt
against the great weight and preponderance of the evidence. See Johnson, 23 S.W.3d
at 11; Malik, 953 S.W.2d at 240. Accordingly, we conclude that the evidence is factually
sufficient to support appellant's conviction for capital murder. Appellant's third and fourth
issues are overruled. 

C. Jury Charge Error


 In her first issue, appellant contends the trial court erred in failing to include an
instruction in the jury charge that the jury could disregard her videotaped statement if it
believed that the statement was illegally obtained.

 Under articles 38.22 and 38.23 of the Texas Code of Criminal Procedure, a jury
"shall" be instructed not to consider certain evidence admitted at trial unless it believes
beyond a reasonable doubt that the evidence was obtained in accordance with the law. 
See Tex. Code Crim. Proc. Ann. arts. 38.22, § 6, 38.23 (Vernon 2005); see also Pickens
v. State, 165 S.W.3d 675, 680 (Tex. Crim. App. 2005). While it is not necessary for a
defendant to request an instruction under article 38.23 to preserve error on this issue, see
Pickens, 165 S.W.3d at 680, a trial judge does not err by failing to submit such an
instruction if there is no factual dispute regarding how the evidence was obtained. See
Garza v. State, 126 S.W.3d 79, 85 (Tex. Crim. App. 2004) (noting that "an Article 38.23
instruction must be included in the jury charge only if there is a factual dispute about how
the evidence was obtained"); Butler v. State, 872 S.W.2d 227, 236 (Tex. Crim. App. 1994)
(explaining that before an instruction under article 38.22, section 7, is required, some
evidence must be presented to the jury raising the issue of voluntariness). Thus, for an
instruction to have been required under article 38.23, appellant had to show there was a
factual dispute regarding whether her statement was illegally obtained, specifically, whether
it was an involuntary, custodial statement.

 The only testimony presented regarding the voluntariness of appellant's statement
was that of Detective Copeland, the officer who interviewed appellant. Copeland testified
that he first made contact with appellant at her home and asked if she would give a
statement. Appellant agreed, and was driven to the police station by Ron. At no time was
appellant taken into custody, handcuffed, or under arrest. Copeland testified that he told
appellant she was free to go any time she wanted and that he never made her any
promises or physical threats. The statement lasted approximately forty minutes. When
appellant said she wanted to go home, the statement was terminated and appellant left
with Ron. 

 Moreover, appellant's videotaped statement that was played for the jury contained
the following exchanges between Copeland and appellant:

Copeland: Okay. You came down here and talked to us or - or
whatever the case was, but when I came over this
morning, just so we - we understand - 


Appellant: Uh huh.


Copeland: - I didn't handcuff you or - 


Appellant: Right.


Copeland: - or drag you out of your home - 


Appellant: Right.


Copeland: - I asked you if you'd come down and give me a
statement - 


Appellant: Right.


Copeland: - and talk to me about this and you said yeah, I'm a
little tired, but you agreed to.


Appellant: Right.


Copeland: But nobody forced you down here?


Appellant: Right.


Copeland: Now, how'd you get here?


Appellant: Ronnie drove me down here.


Copeland: Okay. You understand that you're not - you're not
under arrest, you're not going to be arrested here, you
can leave and - or drink coffee or whatever you want? 


* * * * *


 

Copeland: Do you want anything to drink?


Appellant: No, I want to go home.


Copeland: You want to go home?


Appellant: Uh-huh.


Copeland: All right. You - you don't want - you don't want to finish
this?


Appellant: What else do you want me to tell you?


Copeland: If you want to go home, you are more than free to go. 
Do you want to go?


Appellant: I would like to go get some sleep. You said this would
take a few minutes, I've been here, what, almost an
hour?


Copeland: All right. (inaudible) 9:40. Thank you. 


 Appellant presented no evidence contradicting the testimony of Detective Copeland
that appellant's statement was voluntary, nor did any of the evidence before the jury create
a fact issue regarding whether the statement was voluntary. Therefore, we conclude there
was no factual dispute to justify requiring the trial court to instruct the jury on voluntariness.
See Garza, 126 S.W.3d at 86-87. Appellant's first issue is overruled. 

D. Due Process


 In her second issue, appellant contends she was denied due process of law and
denied her right to a fair jury trial. Specifically, appellant asserts that the State (1)
introduced testimony from witnesses it knew had previously lied to the police, (2) recklessly
lost or intentionally destroyed evidence helpful to the defense, and (3) persistently tried to
introduce evidence it knew was prejudicial and inadmissible. 

 We first address appellant's assertion that the State recklessly lost or intentionally
destroyed evidence helpful to the defense. The government's duty to preserve evidence
is limited to evidence that possesses an exculpatory value that was apparent before the
evidence was destroyed. California v. Trombetta, 467 U.S. 479, 489 (1984). To constitute
a denial of due process, appellant must show that the police acted in bad faith in their
failure to preserve potentially useful evidence, see Arizona v. Youngblood, 488 U.S. 51,
58 (1988), and that the lost evidence was favorable and material. U.S. v.
Valenzuela-Bernal, 458 U.S. 858, 873 (1982); Nastu v. State, 589 S.W.2d 434, 441 (Tex.
Crim. App. 1979). However, before we can make such a determination, we must know
what evidence the State is alleged to have failed to preserve. Although appellant makes
a general assertion that the State has recklessly lost or intentionally destroyed evidence
helpful to the defense, she never states the particular evidence that was lost or destroyed. 
Accordingly, we conclude that appellant has failed to meet her burden of showing that the
State failed to preserve evidence that was favorable and material.

 Appellant's remaining two assertions are directed at the testimony of Joyce Parker. 
Appellant contends the prosecutors were aware that Joyce had lied to them in the past,
and in deciding to use her as a witness anyway, the State violated appellant's right to due
process. In the sworn statement Joyce gave to Detective Copeland in May 2003, Joyce
said that she had attended Jordan's funeral. On direct examination, the State did not ask
Joyce whether she had attended the funeral. On cross-examination, Joyce admitted that
she did not attend the funeral, that she lied about it in her original statement because she
wanted to get back at appellant for hurting Jordan, and that she had called the prosecutor
the night before to tell him about the lie.

 In support of her assertion, appellant cites Napue v. Illinois, 360 U.S. 264 (1959). 
In Napue, the prosecution's main witness testified that he had not been promised any
consideration in return for his testimony, when in fact the prosecutor had promised to
recommend a reduction in the witness's sentence of 199 years. Id. at 266-67. The United
States Supreme Court concluded that in allowing the false testimony to be presented to
the jury, the defendant's constitutional rights were violated; the Supreme Court extended
the principle that a State may not knowingly use false evidence or testimony to obtain a
conviction, to testimony that goes only to the credibility of the witness. Id. at 269.

 However, the factual scenario with which we are presented today is distinctly
different from that in Napue. Significantly, appellant does not assert that any portion of the
testimony given by Joyce Parker at trial was untrue, nor does she argue that the
prosecution was aware that something Joyce said during her testimony was untrue. Were
the prosecution to have either actively solicited or passively allowed false testimony from
Joyce to be presented to the jury on any issue, including the credibility of the witness
herself, it would indeed have been a violation of appellant's rights. See Alcorta v. Texas,
355 U.S. 28, 31 (1957); Napue, 360 U.S. at 269; Mooney v. Holohan, 294 U.S. 103 (1935). 
However, that is not the case here.

 In this case, appellant is essentially arguing that because the State was aware that
Joyce had lied in the past, it could not use her as a witness. While the fact that Joyce had
lied in her previous statement may make her less appealing as a witness, it does not
prevent her from testifying. It is up to the jury to determine whether to believe the
testimony of any witness, including one who is shown to have lied in the past and is
impeached by her own statement. See Sharp, 707 S.W.2d at 614. We conclude that the
State's use of Joyce's testimony did not violate appellant's right to due process.

 Finally, appellant contends that she is entitled to a new trial because the State
consistently tried to introduce evidence that was inadmissible and prejudicial. Specifically,
appellant complains of testimony that she had problems with drugs and that she did not
take care of Jordan, that Ron did. Appellant's objections were sustained, the trial court
instructed the jury to disregard the testimony, and denied appellant's motions for mistrial. 
In this circumstance, appellant is essentially contending that the trial court abused its
discretion in denying her motions for mistrial. Hawkins v. State, 135 S.W.3d 72, 76-77
(Tex. Crim. App. 2004).

 Mistrial is appropriate for only "highly prejudicial and incurable errors," and "may be
used to end trial proceedings when faced with error so prejudicial that 'expenditure of
further time and expense would be wasteful and futile.'" Simpson v. State, 119 S.W.3d
262, 272 (Tex. Crim. App. 2003) (quoting Wood v. State, 18 S.W.3d 642, 648 (Tex. Crim.
App. 2000)). The trial court promptly instructed the jury to disregard the objected to
testimony. See Ovalle v. State, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) ("[O]rdinarily,
a prompt instruction to disregard will cure error associated with an improper question and
answer."). When a trial court instructs a jury to disregard certain testimony, we presume
that the jury follows the trial court's instructions. Ladd v. State, 3 S.W.3d 547, 567 (Tex.
Crim. App. 1999); cf. Wood, 18 S.W.3d at 648 (noting that a trial court is required to grant
a motion for a mistrial only when the improper question is "clearly prejudicial to the
defendant and is of such character as to suggest the impossibility of withdrawing the
impression produced on the minds of the jurors"). Moreover, we note that similar testimony
was presented by other witnesses throughout the trial, without objection. See Stoker v.
State, 788 S.W.2d 1, 13 (Tex. Crim. App. 1989) ("It is well established that when a
defendant offers the same testimony as that objected to, or the same evidence is
introduced from another source, without objection, the defendant is not in a position to
complain on appeal."). After reviewing the record, we cannot conclude that the trial court
abused its discretion in denying appellant's motions for mistrial. Appellant's second issue
is overruled.

 The judgment of the trial court is affirmed.


 FEDERICO G. HINOJOSA

 Justice


Do not publish. See Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and filed this

the 17th day of August, 2006.